Sara Evelyn **EVANS** (f/k/a **Young**)

v.

**Bobby Hugh YOUNG.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

May 15, 2008 Session.

July 31, 2008.

Permission to Appeal Denied by
Supreme Court Jan. 20, 2009.

Michael W. Binkley, Nashville, Tennessee for the Appellant, Bobby Hugh Young.

Irwin J. Kuhn, Nashville, Tennessee for the Appellee, Sara Evelyn Evans (f/k/a Young).

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Sara Evelyn Evans ("Wife") and Bobby Hugh Young ("Husband") were divorced in 1992 at which time Husband was ordered, among other things, to pay $1,800 per month in alimony to Wife until Wife's death or remarriage or Husband's death. In January of 2006, Husband filed a petition seeking to modify his alimony obligation claiming a substantial and material change in circumstances as a result of financial difficulties in Husband's business, health problems impacting Husband's ability to work full-time, and his retirement. Wife opposed the petition and sought an increase in alimony. The Trial Court entered an order finding and holding, *inter alia*, that Husband did not show a sufficient change in circumstances to warrant a modification of alimony. Wife was awarded her attorney's fees. Husband appeals to this Court. We hold that although Husband showed a substantial and material change in his income, Husband did not show that he is entitled to a modification of the alimony. We, therefore, affirm the Trial Court's order.

### Background

Husband filed a petition seeking to modify his alimony obligation claiming, among other things, a substantial and material change in circumstances as a result of financial difficulties in Husband's business and health problems impacting Husband's ability to work full-time. Husband later amended his petition alleging, in part, that additional substantial changes in circumstance had arisen to justify a modification in alimony including the fact that Husband had retired, that Husband's income from his rental properties had decreased, and that Husband's health continued to decline. Wife opposed Husband's petition for modification, sought an increase in alimony, and filed petitions for contempt alleging that Husband had failed to make several months of alimony payments. The case was tried without a jury.

Husband, who completed his junior year of high school and later earned a GED while in the Navy, testified that he would be 68 years old within a few weeks of trial[1]. After his honorable discharge from

---

1. Husband testified to this during the first day of trial. After that day, the trial was contin-

the Navy, Husband went to work for Levy Wrecking Company in 1961 or 1962 performing heavy manual labor involved in demolishing buildings[2]. Pursuant to an agreement reached years ago with the then owner of Levy Wrecking Company, Husband performed the manual labor and received 50% of the profits of the business. Husband described his job as "doing manual work, taking the structures down by hand, loading steel on trucks, loaded bricks on trucks." The record shows that Husband earned a very good living working for Levy Wrecking Company. Husband's 1990 individual income tax return showed an adjusted gross income of $418,705, and his 1998 individual income tax return showed an adjusted gross income of $266,827.

In 1997, Husband had open heart surgery. At that time, Steve Vaughn was handling the business end of Levy Wrecking Company. Husband was unable to resume heavy physical labor when he returned to work after his heart surgery, and so he then "was around the office there and on the job observing."

In 2001, Steve Vaughn bid an interior demolition project for Centex Rodgers at Vanderbilt University, and Levy Wrecking Company was awarded the job. However, the job turned out to be different from what was bid and took about 75% longer to complete causing Levy Wrecking Company's costs associated with the project to be higher than anticipated. Husband stated:

we kept doing the work as [Centex] suggested and we kept dishing out the money and also we were—Levy Wrecking Company was performing two other jobs over there at Vanderbilt for Centex Rodgers, and it came to a point where we just ran out of money and we went— Steve Vaughn told them we couldn't go any further unless they paid us and they wouldn't pay us.

Husband testified that Centex would not pay Levy Wrecking Company and Levy Wrecking Company was not able to pay its subcontractors and, as a result, Levy Wrecking Company was "ruined" and was closed. A lawsuit ensued and Levy Wrecking Company was awarded only the money they owed to their subcontractors plus $60,000. Husband testified that the $60,000 went to attorney's fees. Husband retired in late 2002.

Husband testified that he had personally guaranteed some of Levy Wrecking Company's debts. Husband testified that he had to pay the premium on a bond and that he had already paid this debt in full. Husband also testified that he was liable personally for an American Express credit card debt of approximately $30,000; a Wells Fargo credit card debt of approximately $40,000; a credit line of $200,000, of which Husband claimed that approximately $130,000 had not been paid as of the time of the trial of this matter; and corporate taxes due to the State of West Virginia in the amount of $3,500, of which $3,000 had not been paid. Husband testified that he paid down the line of credit from $200,000 to $130,000 by selling the assets of Levy Wrecking Company when the business closed.

Husband testified that he paid $25,000 shortly before trial toward the business line of credit using money acquired from the sale of some real property that Hus-

---

ued due to health problems experienced by Wife. When trial resumed almost one month later, Husband was 68 years old.

**2.** The record reveals a brief period of time during which Husband left Levy Wrecking Company and worked for another employer before returning to work for Levy Wrecking Company and becoming a partner in the business.

band owned located on Dickerson Road. Husband explained that about three or four years before the trial, he sold off five acres of the Dickerson Road property for approximately $120,000 and "paid off what was owed on it, paid the commission, and I ended up with about 21,000 on that, and I used it to pay company expenses." Husband testified that he recently sold the last parcel that he owned of the Dickerson Road property for $25,000 and that he used $15,000 of this money to pay toward the line of credit with the remainder paid toward the bond premium previously discussed.

Husband admitted that he never notified Wells Fargo or American Express that Levy Wrecking Company was closed. Exhibits introduced at trial showed that Husband still maintains the Wells Fargo business credit card and continues to take regular cash advances against this card even though the business closed several years ago. The Wells Fargo credit card statement with a closing date of January 30, 2006, shows a previous balance at that time of $991.08, far less than the $40,000 Husband testified at trial was owed. Husband admitted that as of April 2006, he had a credit line with Wells Fargo of $82,000. Wells Fargo statements with closing dates of July and August of 2006, months covered by Wife's petitions for contempt, show that Husband took cash advances against the card for $11,978.66 and $5,533.50 respectively. Further, Wells Fargo statements with closing dates of August and September of 2006, also months covered by Wife's petitions for contempt, show that Husband had made payments on the card toward the previous month's bill totaling $5,000 and $10,000 respectively.

At the time of trial, Husband was receiving Social Security income of $1,628 per month, an Ironworks pension of $924 per month, and a Central pension of $679 per

month. In addition, Husband receives monies from real estate holdings. Husband is the sole shareholder of Stadium Properties, which holds Husband's interest in two income producing portable office structures on Lemuel Road, and Husband's 50% interest in commercial real properties owned by BR Partners. Husband testified that he started Stadium Properties five or six years ago to hold several properties.

Husband testified that he acquired the two portable office structures on Lemuel Road in an exchange with his daughter and son-in-law in February of 2006. Husband exchanged a parcel of real property that had been on the market for approximately eight years for these two income producing structures, which are held by Stadium Properties. Husband receives income of $1,410 every month from the rental of the two portable office structures. The two portable office structures were appraised for tax purposes at $213,000.

Attorney Elizabeth Ginsberg Tannenbaum testified regarding Husband's interest in BR Partners. Ms. Tannenbaum explained that her father was Husband's business partner for many years and now she and her sisters are partners with Husband in BR Partners. Husband, through Stadium Properties, owns a 50% interest in the real property owned by BR Partners. BR Partners owns a total of six parcels of real property located in a commercial trucking area of Nashville. The largest of those parcels was appraised for tax purposes at one million ninety-three thousand five hundred dollars. The other parcels were appraised for tax purposes at $33,500; $18,000; $18,800; $102,000; and $57,500. However, Ms. Tannenbaum testified that the parcel appraised at $102,000 was appraised with a building on it that no longer exists. She estimated that the value of that parcel without the building is $65,300. No indebtedness other than ac-

crued taxes for the year was owed on any of these properties.

Husband was questioned about his interest in BR Partners and testified:.

Q. Now, let's talk about the Fesslers Lane property [owned by BR Partners]. You have listed here, just as Ms. Tannenbaum testified, you're 50 percent owner through your business called Stadium Properties, correct?

A. Yes.

Q. You have a fair market value of 800,000; is that correct?

A. Yes.

In his brief on appeal, however, Husband asserts that his "fifty percent (50%) interest in BR Partnership (sic) is valued at approximately Six Hundred Fifty Thousand Dollars ($650,000.00)." (footnote omitted). In support of this number, Husband's brief cites to Ms. Tannenbaum's testimony regarding BR Partners. Either way, the evidence shows that Husband's interest in BR Partners is within the range of $650,000 to $800,000.

Ms. Tannenbaum testified that one of the parcels owned by BR Partners was previously leased to Goodyear Company, but that lease had terminated. At the time of trial, the property had been listed and was being shown to potential new tenants. Ms. Tannenbaum also testified that the vacant parcels had been listed for sale. She stated: "They have not had much interest prior to the end of 2006. There was some interest towards the end of 2006, and after discussions with [Husband], we did all agree that we should retain the empty property until the primary property's released in case there's a tenant who would need extra land for the business."

In 2006, Husband received approximately $22,500 in distributions from BR Partners. In 2005, approximately $53,400 was distributed to Husband by BR Partners. In 2004, Husband received approximately $51,000 in distributions. Ms. Tannenbaum testified that the last distribution made prior to trial was in June of 2006. She stated:

before that distribution, we had—[Husband] and I had talked on the phone. I talked about engaging Mr. Wentmore (phonetic) to start marketing the property and that we should stop making any distribution from the partnership until— because there might be needed funds for repairs or maintenance or vacancy.

And at that time, he told me that could he not have one more distribution. Actually, there was an email telling all the partners that there would be no distributions and then he wanted an additional distribution. We agreed to distribute him an additional $10,000 and that distribution was made and distributed.

Ms. Tannenbaum testified that when asking for the additional distribution, Husband had told her that "[h]e had either gone to or was coming back from a trip to Italy and needed money." Husband denied ever saying that he was going to Italy in 2006 and provided his passport that shows his last trip out of the county was in 2004 when he went with a group to Spain. Husband's passport shows that since he retired, Husband has traveled to Spain, Germany, and the Czech Republic on vacation.

Husband testified that he purchased the house he was living in at the time of trial in 1999. He testified that his home has a fair market value of approximately $220,000, and that he financed 100% of the price. A tax appraisal dated June 21, 2007, and introduced at trial shows an appraised value for the house alone of $224,000, and the house and land together of $260,000.

Husband owns two motor vehicles, a PT Cruiser and a Buick LeSabre. Husband

testified that the PT Cruiser is a 2000 model that cost "around 15" and is worth approximately $4,000 and the Buick is a 2001 model for which he paid "in the 30's...." Husband's income and expense statement introduced at trial shows an automobile payment of $864 per month for the "2001 Buick Financed for 60 months with an additional $14,000.00 from abandoned vehicle from Mr. Vaughn." Husband explained that this $864 includes financing for two automobiles because

> Mr. Vaughn that worked for Levy Wrecking Company and myself, the company purchased and furnished him an automobile, and then when he quit, Levy Wrecking Company was still liable for the payment of the car, and for me to trade my car, which was worn out, I had to include that 14,000 that was owed on his car into this car, so the money borrowed, GMAC paid off that 14,000, so we financed this Buick for 60 months at 864.

Husband stated that he has been paying on his Buick for five years. Husband's income and expense statement, however, claims that Husband still owes $7,500 to GMAC for his Buick.

Husband's income and expense statement shows that Husband has income of $3,745.00 per month and expenses of $8,869 per month. When asked how he has paid the outstanding $5,124 shown on his income and expense statement, Husband stated:

> Up until June 6th of 2/07, I was receiving monies from the Lebanon Road [property owned by BR Partners] there. I was paying these out of my personal monies, and now since June 2/06, I paid—... 2/07, sorry.... I paid—might be a little bit confusing, but I paid on the 15th of the month. I used the American Express card to pay Wells Fargo their monies.... I take a draw from American Express and pay Wells Fargo, and then on the 25th of the month, I take Wells Fargo and pay American Express, take a draw off of that, and I have been doing this since I haven't been getting any money from the rental on Lebanon Road, because if I don't, they're going to sue me and garnishee all my wages.

The record on appeal contains petitions for contempt filed by Wife alleging that Husband failed to pay alimony as ordered for July, August, September, and October of 2006. Copies of checks introduced at trial show that on April 10, 2006, Husband wrote a check to Patsy Bowman for $75. Husband stated: "She's a lady that does my hair.... She did the perm for me and cut." On June 21, 2006, Husband wrote another check for $75 to Ms. Bowman for a perm. A couple of weeks later, on July 6, 2006, Husband wrote an alimony check for $250, instead of the $1,800 he was ordered to pay. When questioned, Husband stated that he had written the check for $250 because: "That's all that I had, sir." The record also contains copies of five checks that Husband wrote to Joanne Maddox during the period from April of 2006 through July of 2006. Four of those checks are for $170 each and the fifth was written for $375. The record also contains a copy of a check that Husband wrote for $170 to Joanne Maddox dated September 15, 2006. Husband initially testified that Ms. Maddox helped him clean his house before he had surgery on his arm and that she also helped him by doing some work at his rental building. Later during the trial, Husband testified that Joanne Maddox is a registered physical therapist and that he was paying her for physical therapy because his insurance "only covered ten visits and the doctor recommended twenty-one."

Husband admitted that he took trips to Illinois and Iowa in 2006. Husband testi-

fied that he went to Iowa for a reunion and claimed he spent "[n]ot over $300" for that trip. Husband also admitted that in 2005, he made two purchases of furniture from Tom Harris Auctions, one in the amount of $921 and one for $4,928. In April of 2006, Husband traveled to Georgia and South Carolina to go to Darlington for NASCAR. Husband testified that he paid for the trip using a credit card.

In February of 2006, after he filed the petition to reduce alimony, Husband spent $350 for Talledega Speedway "to maintain my ticket for the following year that I had seats for the last ten years, and if I didn't get them, I'd lose them, never get them back." Husband also maintains a PSL for the Tennessee Titans NFL team for $1,200. Husband testified that he sold his Titans tickets for 2006 and 2007 to the McConnels who own the Red Pony Restaurant in Franklin.

When Husband and Wife divorced, Wife received several significant assets including the marital home worth approximately $200,000 with an approximate debt of $80,000. Wife continued to live in this home for approximately six years. In 1997, Wife sold the home and purchased a condominium for approximately $76,000. She lived in the condo until 2004, and then sold the condo to her daughter Deborah's ex-husband. Wife then moved in with her daughter Deborah.

Wife testified that beginning in January of 2004, she began paying Deborah's mortgage, which was approximately $1,000 per month. Wife also paid Deborah's property taxes. Wife testified that she paid Deborah's utilities, automobile insurance, food, cigarettes and liquor and gave her cash. Wife paid for new floors in Deborah's house and a new alarm system. Wife also allowed Deborah to use her credit cards and stated: "Under duress, I did." Wife admitted that she gave Deborah at least one car. Wife testified that she lived with

Deborah for approximately two years and at the end of that time, Wife had no money left. Wife testified that Deborah took all of Wife's furniture. Wife filed a lawsuit against Deborah seeking, among other things, the return of Wife's furniture. As best as we can determine from the record on appeal, this other lawsuit still is pending.

Wife also was questioned about whether she gave her son $4,000, and stated: "Maybe I give him 1,000 or maybe I give him 2,000 or maybe I give him 3,000. I don't remember. That was all about the time that I realized [my daughter] was pumping me dry." Wife stated: "[Deborah] literally stole from me.... She still got my furniture. She still got my father's love letters to my mother that she won't let me have. Everything in my life, 75 years, last of my years of my present and that will be my past." When questioned about why she let Deborah take her money, Wife stated:

I couldn't keep her from it. I couldn't keep her from it. I said, 'Stay out of my bank account,' and she'd just go right on and get it and pay no attention to me.... I needed her. I needed her to write my checks, my bills, because my hands were so swollen that I couldn't hold a pencil in my hand, and after that, I started taking 18 fish oil pills a day and my hands are not swollen anymore. That's the truth about that.

Wife testified that at the time of trial, she was 76 years old and was staying at a rehab center where she was admitted for heart problems discovered during a hospital stay after Wife fell and injured her knee. When she is not in the rehab center, Wife lives in a public housing apartment for senior citizens. Wife testified that her electricity was shut off last summer and her granddaughter paid the bill to get it turned back on. Wife's granddaugh-

ter also has paid for Wife's groceries at times. Wife testified that she once was threatened with eviction for failing to pay her rent. When asked what happened after she received the threat of eviction, Wife stated: "Nothing, because I paid it and I let everybody else wait instead of them." Wife testified that the IRS seized her bank account at one point because she did not pay her income tax. She stated: "If I had the money, I would have done it. I always did." Wife stated that the IRS "called me [at some point prior to October of 2006] and told me that it was— was an unpayable debt" and that they had written it off. However, an exhibit introduced at trial received by Wife from the IRS in February of 2007 and captioned Final Notice/Notice Of Intent to Levy And Notice Of Your Right To A Hearing shows that Wife owes the IRS $697.86. Wife testified she owes another daughter, Wanda, "8 to 900" dollars and her other daughter, Kelly, "6 to $800." Wife also testified that she owes her granddaughter, Ashley, for legal services and for groceries, but Wife did not know how much is owed to Ashley. Wife owes her attorneys approximately $25,000.

Wife receives $367 per month from the Central pension fund and $1,023 from Social Security. Wife also is supposed to receive $1,800 per month in alimony. Wife's income and expense statement introduced at trial shows that Wife has a total monthly income, not including alimony, of $1,390.88 and monthly expenses totaling $2,516.12. Wife testified that those expenses include $465 per month for rent, $25 for phone, approximately $65 for electricity, $67 for cable, $47 for her cell phone that she uses for long distance because her home phone does not have long distance, and $30 for life insurance for burial expenses. Wife testified that she also pays approximately $87 per month for home health insurance, $80 for auto insurance, $208 for Medicare supplemental insurance,

and $137 to rent a washer and dryer. Wife testified that she takes medications for arthritis, depression, a thyroid condition, asthma, and heart problems, but that she does not take some of the drugs prescribed for her because she cannot afford to purchase them.

Wife testified that she owes $15,000 on her Citi Bank credit card as a result of her problems with Deborah. Wife also was questioned about a bill she owes on a store credit card and she stated:

Yes, they put that interest on there because I didn't pay it. One time they told me I owed 139 and I went in and paid that 139. I wrote a check for 139, and then I got another bill the next month that said I owe 159, and I said, If they keep doing this stuff, make me pay everything and left a balance, in order to get my balance down, it's going to take forever, so I decided, Well, I'm not going to pay that no more.

The Trial Court entered an order August 16, 2007 finding and holding, *inter alia*:

The parties were divorced on January 10, 1992. The case was a highly contested matter. The Court made a division of a large marital estate with both parties receiving substantial assets. The wife in addition to her share of the marital estate was awarded $1,800.00 per month as alimony ... until her death or remarriage or his death. Further the decree specified this amount would not be altered by wife's eligibility for social security or pension payments.... This marriage was one of long duration at the time of the divorce. The former wife was 60 years old and unable to work to maintain her necessary expenses.

The [Husband] has tried unsuccessfully to have his alimony reduced in the past and has expended large sums of

money in attorneys (sic) fees by failing to pay his alimony obligation as ordered until he is the subject of [a] contempt petition, at which time he purges himself.

* * *

During the proceedings in this matter [Husband] purged himself of his contempt for failure to pay the alimony to his former wife as per the Final Decree of divorce and paid to her the sum of $10,800.00 in open Court with a check payable to [Wife] and her attorney and the same is being held by her attorney in escrow as they have significant legal fees involved herein. This payment brought him current as of June 30, 2007. The Court deems [Husband] has purged himself of his contempt and the Court will assess no jail sentence at this time for his willful contempt over the objection of [Wife's] attorney. Thus, the most recent Petition for Contempt is dismissed at the cost of [Husband].

* * *

[Husband] for the past two years has not paid the alimony as ordered, but will pay when subjected to a contempt petition. [Husband] has retained assets awarded him at the time of the divorce in January 1992, and for many, many years produced income in six figures. He testified in 1997 he had blockage of a heart valve and was not able to work as before, but continued in the business end instead of actual labor. He said the business folded in 2002 because of a contract with Centex Rodgers and Chancery Court litigation. He alleges he was in debt and had guaranteed debts, but did manage to pay off many creditors and liens. He continues to pay these debts and has borrowing power. He has not re-opened his business. He owns substantial assets and has traveled to Europe. He has paid all his expenses, except his alimony payment.

He has had a decrease in rental property income and is a co-owner of commercial property with the Gensburg Tantenbaum [sic] family. [Husband] owns 50% of this partnership.

The proof shows that [Husband] owns his homeplace and has equity therein. He has sold his company assets to pay his obligations and he has substantial borrowing power. He owns several pieces of real estate and two structures, which produce rental income. He has a $40,000.00 limit on his credit card.

* * *

[Husband] appears in Court straight, tall and able-bodied. He is very alert, articulate and is a good businessman. He is mentally alert and has marketable skills because of his 41 year work history in the demolition industry. Although he is now retired, he has substantial assets with which to pay his alimony obligation of $1,800.00 per month. He pays all other obligations. His retirement was foreseeable and he has valuable assets. His loss of $2,800.00 in rental income is not sufficient to alter the alimony award which the Final Decree ordered. [Husband] has assets which are substantial.

* * *

[Wife] has serious health problems. She appeared in Court to conclude this case in a wheelchair. She is suffering from a knee injury and cannot walk. She is in physical therapy, she is 76 years old and is destitute. The testimony shows an adult daughter has taken most of her assets and this Court feels, although she is not mentally incompetent, she has no power to keep people from abusing her financially, whether it is her adult daughter or [Husband]. [Husband] has used this unfortunate incident of her adult daughter's activity to

ask that his alimony be reduced because she was a victim.

[Wife] now resides in a rehab center since her knee injury. After her release she will return to her home in Smyrna. She is in debt because of [Husband's] failure to pay her alimony payments. She has no funds to pursue recovery of monies taken by the adult daughter. Her expenses are not excessive. Her debts are excessive due mostly to her attorneys (sic) fees in securing her alimony payments from [Husband]. She is very disadvantaged, she has a need for the continuing alimony payment per month of $1,800.00 and [Husband] has the ability to pay.

\* \* \*

The Petition of [Husband] to reduce his alimony obligation is hereby dismissed. There is no sufficient change of his circumstances to warrant the same. The Court finds his health is not a sufficient factor to reduce his alimony payments as he is in good shape for a man his age and he is able to travel and enjoy a very comfortable lifestyle to which he is entitled. He has a sizeable estate and manages to pay all obligations, except his alimony payment. The fact he has had a reduction in his income as to his rental property is not sufficient to reduce his alimony obligation. [Husband's] Petition to Modify is most respectfully dismissed at his costs.

[Husband] is hereby ordered to pay his alimony obligation by the 1st day of each and every month commencing with the 1st day of August, 2007. The wife has been placed in serious economic circumstance by [Husband's] complete failure to pay her alimony on time. [Husband] will pay the cost of this cause, plus former wife's reasonable attorney fees in the amount of $24,736.30 as further alimony being a judgment in her favor

against the former husband necessary for her support, non-dischargeable in bankruptcy.

The Trial Court also denied Wife's petition for an increase in alimony and awarded Wife attorney's fees.

Husband appeals to this Court.

### Discussion

Although not stated exactly as such, Husband raises two issues on appeal: 1) whether the Trial Court abused its discretion in denying Husband's petition to reduce alimony; and, 2) whether the Trial Court abused its discretion in awarding attorney's fees to Wife. Wife requests an award of her attorney's fees on appeal.

Our Supreme Court set out the standard of review to be applied in cases involving a request for modification of a spousal support order stating:

Because modification of a spousal support award is "factually driven and calls for a careful balancing of numerous factors," *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn.Ct.App.1989), a trial court's decision to modify support payments is given "wide latitude" within its range of discretion, *see Sannella v. Sannella*, 993 S.W.2d 73, 76 (Tenn.Ct.App.1999). In particular, the question of "[w]hether there has been a sufficient showing of a substantial and material change of circumstances is in the sound discretion of the trial court." *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn.Ct.App.1999) (citations omitted). Accordingly, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes." *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn.Ct.App.1998); *see also Goodman v. Goodman*, 8 S.W.3d 289, 293 (Tenn.Ct.App.1999) ("As a gen-

eral matter, we are disinclined to alter a trial court's spousal support decision unless the court manifestly abused its discretion."). When the trial court has set forth it factual findings in the record, we will presume the correctness of these findings so long as the evidence does not preponderate against them. *See, e.g., Crabtree v. Crabtree,* 16 S.W.3d 356, 360 (Tenn.2000); *see also* Tenn. R.App. P. 13(d).

*Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn. 2001).

In order to obtain a modification of a spousal support award, the party seeking modification must show a substantial and material change of circumstance. Tenn. Code Ann. § 36–5–121(a) (2005). Prior to *Bogan,* courts dealing with the issue of whether a retirement could constitute a substantial and material change of circumstance applied the rule that "obligations voluntarily assumed are not proper to be considered as changed circumstance[s] to reduce support payments otherwise owed...." *Bogan,* 60 S.W.3d at 728 (quoting *Dillow v. Dillow,* 575 S.W.2d 289, 291 (Tenn.Ct.App.1978)). However, in *Bogan,* our Supreme Court held:

> that when an obligor's retirement is objectively reasonable, it does constitute a substantial and material change in circumstances—irrespective of whether the retirement was foreseeable or voluntary—so as to permit modification of the support obligation. However, while bona fide retirement after a lifetime spent in the labor force is somewhat of an entitlement, an obligor cannot merely utter the word "retirement" and expect an automatic finding of a substantial and material change in circumstances.

Rather, the trial court should examine the totality of the circumstances surrounding the retirement to ensure that it is objectively reasonable. The burden of establishing that the retirement is objectively reasonable is on the party seeking modification of the award, *cf. Seal v. Seal,* 802 S.W.2d 617, 620 (Tenn. Ct.App.1990), and the trial court's determination of reasonableness will not be reversed on appeal absent an abuse of discretion, *see, e.g., Crabtree,* 16 S.W.3d at 360.

\* \* \*

However, even when an obligor is able to establish that a retirement is objectively reasonable, and therefore that it constitutes a substantial and material change in circumstances, the obligor is not necessarily entitled to an automatic reduction or termination of his or her support obligations. As evidenced by its permissive language, the statute permitting modification of support awards contemplates that a trial court has no duty to reduce or terminate an award merely because it finds a substantial and material change in circumstances. *See* Tenn. Code Ann. § [36–5–121(a)[3]]. Instead, the change in conditions resulting from retirement merely allows the obligor to demonstrate that reduction or termination of the award is appropriate. *Cf. McFadden,* 563 A.2d at 184; *Silvan,* 632 A.2d at 530. Accordingly, when assessing the appropriate amount of modification, if any, in the obligor's support payments, the trial court should consider the factors contained in Tennessee Code Annotated section [36–5–121(i)][4] to the extent that they may be relevant to the

---

**3.** Our statutory scheme has been amended since the release of *Bogan.* The language as discussed in the quotation from *Bogan* previously appeared at Tenn.Code Ann. § 36–5–101(d)(2). We have substituted the current citation for ease of reference.

**4.** As discussed in footnote 3, we again substitute the current citation for ease of reference.

inquiry. *See, e.g., Watters,* 22 S.W.3d at 821; *Seal,* 802 S.W.2d at 620; *Threadgill v. Threadgill,* 740 S.W.2d 419, 422–23 (Tenn.Ct.App.1987).

*Bogan,* 60 S.W.3d at 729–30 (footnote omitted).

The Trial Court made no specific finding regarding whether Husband's retirement was objectively reasonable. The Trial Court erred in treating Husband's retirement as a non-factor by finding that it was foreseeable and that he appears able-bodied and, apparently, able to work. This was not the correct standard to apply to Husband's retirement to comply with *Bogan.* Considering the evidence in the record relevant to Husband's retirement as required by *Bogan* shows that at the time of trial Husband was 68 years old; that he had performed manual labor during the majority of his working life; that Husband had completed a GED, but had no further formal education; that Husband had undergone open heart surgery in 1997; and that Husband's business, Levy Wrecking Company, was no longer in existence. The evidence more than supports a finding that Husband's retirement was objectively reasonable, and we so find.

■ The fact that Husband's retirement was objectively reasonable, however, does not end the inquiry into whether a modification of alimony is proper. The Trial Court did specifically find that Husband "has a sizeable estate and manages to pay all obligations, except his alimony payment. The fact he has had a reduction in his income as to his rental property is not sufficient to reduce his alimony obligation." The Trial Court found that Husband still has the ability to pay $1,800 per month. The evidence does not preponderate against these findings.

Husband did not include any income on his income and expense statement from his 50% ownership in BR Partners. However, the record shows that during the three years prior to trial, Husband received from $22,000 to $53,000 per year in draws as a result of this interest. Husband argues that he has lost significant rental income because the property was not rented at the time of trial. However, the record shows that the property is valuable commercial property located in Nashville and that it was actively being shown to potential renters at the time of trial. Although partnership distributions may have ceased at the time of trial, the record is devoid of any evidence showing that the BR Partners' real property would not again be rented and income producing. There is no evidence showing that the loss of this income is anything other than a temporary situation. There also is no evidence that this real property would not be rented for as much, or even more, than the previous tenants were paying. Thus, Husband was, at best, disingenuous regarding his failure to include this source of income on his income and expense sheet.

Also relevant with regard to Husband's interest in BR Partners is the fact that at the time the Trial Court granted the divorce, it found:

> the company known as Levy Industrial Contractors, Inc. not to be a marital asset as both parties have transferred their interest in and to the same voluntarily to the daughter of the parties. Further, the Court finds the assets of this company, including the BR Partnership interest is likewise not a marital asset of the parties due to the voluntarily (sic) gift made to the daughter by the parties. It is of note that [Husband's] retention of the control of this business with complete management powers by the exhibited Proxy, enables him to completely dominate his daughter's business for a fixed period. Whether or not he could reap the benefit of the BR Partnership asset through this arrangement remains to be seen and would obviously

have to involve consent of the daughter at some point in time.

At the trial now before us on appeal, Husband admitted that he purchased the BR Partners interest back from his daughter "a few years back, I can't remember how long it was. . . ." As the income from BR Partners was not part of Husband's income that was considered at the time the divorce was granted and the alimony set, any income from BR Partners is additional income that Husband has gained after the divorce decree was entered.

While Husband claimed at trial that he was saddled with multiple debts from his now defunct business, the evidence showed otherwise. Husband claimed that he still owed $40,000 on the Wells Fargo business credit card, but the statement for this card with a closing date of January 30, 2006 shows a previous balance at that time of only $991.08. The record further reveals that Husband has continued to take regular cash advances against the Wells Fargo account long after his business closed and that during two of the months when Husband was not paying his alimony, he was making payments toward this card of $5,000 and $10,000.

Husband argues on appeal that Wife's need "is not absolutely clear in light of her income and expense statement that shows a monthly deficit of only One Thousand Dollars ($1,000.00), her incredible loss of a huge nest egg, and the fact that her family is giving her financial help." Of course, Wife never had the burden to prove that her need was "absolutely clear. . . ." A careful and thorough review of the record reveals that Wife proved a need for $1,800 per month in alimony at the same trial in which she was awarded the significant assets that Husband refers to as "a huge nest egg." Notwithstanding the fact that Wife no longer has those assets, she has shown the same need for alimony exists as when she had those assets awarded to her.

Wife did fail to show her need had increased even though she no longer has those assets. Despite Wife's failure to show that her need had increased in excess of the $1,800, Wife did show expenses that were in addition to those for which she was able to put a specific dollar amount. For example, the record shows that Wife has a need for additional prescription medications which she does not take simply because she has been unable to afford to purchase them.

The record shows that Husband did have a substantial decrease in his income due to the failure of his business and his retirement. Likewise, the record shows, as found by the Trial Court, that Wife still has the same need of $1,800 as she had when the parties were divorced. Despite Husband's significant decrease in income, the evidence does not preponderate against the Trial Court's finding that Husband still has the ability to pay to Wife $1,800 per month in alimony and that Wife still has the need for $1,800 per month in alimony.

Taking into consideration the factors contained in Tenn.Code Ann. § 36–5–121(i), we find no abuse of discretion in the Trial Court's decision that Husband did not show that modification of the alimony award is proper. We, therefore, affirm the Trial Court's dismissal of Husband's petition.

■ We next consider whether the Trial Court abused its discretion in awarding attorney's fees to Wife. It is well settled that:

The trial court's decision to award attorney's fees is considered an award of alimony. *Long v. Long,* 957 S.W.2d 825, 829 (Tenn.Ct.App.1997). An appellate court will not interfere with the trial court's decision to award attorney's fees unless it is shown that "manifest injus-

tice would be done if the award is allowed to stand." *Id.*

*Freeman v. Freeman,* 147 S.W.3d 234, 244 (Tenn.Ct.App.2003). We find no abuse of discretion in the Trial Court's award of attorney's fees to Wife as Husband has not shown that manifest injustice will be done if the attorney's fee award stands.

In the exercise of our discretion, we find that Wife is entitled to an award of attorney's fees on appeal, and we remand this case to the Trial Court for a determination of the proper amount of those fees.

### Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for a determination of the proper amount of attorney's fees on appeal to be awarded to Wife, and for collection of the costs below. The costs on appeal are assessed against the Appellant, Bobby Hugh Young, and his surety.